Good morning. With the pleas of court, Clay Robbins on behalf of Appellant. The district court in this case determined as a matter of law that DBT cannot be caused by an accident, as that term is utilized under Article 17. The Court's decision, although it doesn't explicitly articulate it, the Court's decision in that regard seems to be based upon its analogizing what happened to Ms. Rodriguez to what happened to the plaintiff in the Sachs case. In other words, it says that the loss of hearing in Sachs equates with the development of DBT in Ms. Rodriguez. The difference in this case, though, and it is a significant difference, is that in this case we have evidence that there was a substantial amount of knowledge on the part of the carrier about this risk and about reasonable steps, easy steps that could be taken to reduce this risk. And the carrier made the decision not to impart that information on to passengers. Well, you can view this case, and I want to see how you're arguing it, as DBT, the occurrence of DBT being the accident, or the failure to warn being the accident. I was Under Hussain, that's a distinction we have to draw, isn't it? Absolutely. And under Hussain, in the way I argue this case and the way I've always looked at this case, is that DBT is the injury and that the accident is the decision on the part of the carrier not to impart information to the passenger with which the passenger could then make decisions or take steps to avoid that risk. So it's a failure to warn. The failure to warn is the accident, yes. Now, if that's the accident, if one looks at Hussain, they talk about and have some little debate about the DBT cases. What do we make of that? What do you make of it? The footnote 9 and then Justice Scalia's dissent. Well, there's certainly a split between the majority and Justice O'Connor and Justice Scalia, but what we do take from the Hussain case is most definitely the United States, the U.K. and Australia, insofar as the evaluation of accident. The U.K. and Australia have taken the position that an Article 17 accident requires an affirmative act. And it does so, and I know the Court has reviewed those opinions. It does so in almost a metaphysical fashion. It goes on page after page after page, trying to make a distinction between an act and omission. And my position below, and it has been throughout this case, is that that's an artificial distinction. We all know that omissions can cause serious injuries just as easily as affirmative acts do. Well, it seems pretty clear, Justice Thomas, and the majority didn't buy the neat distinction that the stewardess's failure in Hussain was an affirmative refusal to sit. It was a – they didn't pick up on that. But the question that I have as to how the majority did deal in footnote nine and ultimately did deal in Hussain to uphold, in a rare occurrence, uphold the Ninth Circuit opinion, was the following. First of all, Justice Thomas says that the DVT case is factually distinguishable. Secondly, in rejecting the passive-active distinction, Justice Thomas's opinion emphasizes that there's an unexpected event or occurrence and reads that as failure to follow industry practices and standards or airline practices or standards. My reading of the record here is that there's no – at that time, anyway, in September 2000, there was no industry practice to warn against the hazards of DVT. If by that the Court means was there something that was adopted in all airlines to warn of this danger, I would agree that there was not such an industry-wide practice. There were airlines who were warning. We know that Lufthansa was warning at that time. We know that Singapore was. And Cafe Pacific, I believe, was warning. It's specifically about DVT, not just about how to, you know, keep comfortable during the course of a flight. But I think that the important distinction that Justice Thomas makes in Hussain is that the – the bugaboo, if you will, about an act or omission really doesn't need to be gone into, although Justice Thomas does try to say, well, this is really an affirmative act because it goes through the same process as the DVT and POVI cases, where they basically try to reformulate what occurred into an affirmative failure to act, almost a default. So – but the Court, I think, almost does that as an aside to the courts in the U.K. and Australia. But what the case most definitely holds, and Justice Scalia clearly understands that, is that the United States has departed and that you really can't just say, well, there's a factual distinction between DVT and what we're dealing with here, because, you know, although the Court may say that because courts never like to address or decide issues that are not before it, nonetheless, the analysis that the Hussain Court adopts is most definitely diametrically opposed to what the courts in Australia and the U.K. have undertaken in evaluating this issue. In the United States, an omission, here a failure to warn, can be and should be considered as an accident. Kennedy. No, but that's – you know, see, Hussain is rejecting, under the Warsaw Convention, as I read it, a negligence regime. There still has to be – at least as I read Hussain. You can disabuse me, but my reading of it is that the Court was focusing on the failure to follow standard industry practice, company policy. That's the unusual event or occurrence, the failure to follow established procedures and not some negligence concept of, well, they should have been on reasonable notice and that – because otherwise, that case could have been decided on the stewardess or the airline, having been reasonably aware that somebody with emphysema, the condition he had, exposed continuously to smoke before he boarded, and then while he was on the airplane, they could have gone off on a negligence standard. Indeed, we got chastised for, in the Court's opinion, somehow implying that maybe it was a negligence standard. So given that clear rejection of negligence, it seems to me the burden on you is to establish what's the – under Hussain, what's the unusual event or occurrence. I think the unusual event must be gauged from the standpoint of the passenger himself. Does the passenger expect to get this important health-related information? And the answer to that question would be, sure, when you pay the money that you pay to take an international flight, you would expect to be given by the carrier information the carrier has regarding risks that may cost the life of that particular passenger. But if three – if three out of 25 or 30 major international airlines are the only ones warning about this, then is it really unusual? Well, it is unusual from the standpoint of would you not expect airlines to give this information to the public? And you're almost allowing the airline to – It has to be unusual. In other words, you're pasting this happening against some kind of a background and said, whoops, this is an unusual happening. So what makes it unusual when a great, great bulk of airlines don't do it? Well, and if you fast forward, the airlines are now doing it. Right. And it's based upon information that they had even at that point, and now they're getting caught up with it. Okay. Now, that's a great negligence argument. Agreed. But I think that the mere fact that the Court is instructed not to embark upon negligence analysis doesn't mean in evaluating what is unexpected or unusual, you can't take a look at such things as standards. But the standard isn't the sine qua non on what is or what is not going to be unexpected or unusual, because if it is, then you put it all on the airline to make the determination of what is unexpected or unusual. And the airline can just, by failing to do something, force the subject and basically by putting its head in the sand, cause these injuries by not doing the steps that a reasonable  passenger is entitled to expect. Yes, it is. I think that the expectation, what is unexpected and what is unusual, has to be determined from the standpoint of the passenger. I think that it makes a very, very bad policy statement to allow the carrier to make that determination. The carrier has different interests, obviously, than the passenger.  If it has, if he has a particular susceptibility that it take, that he take or he, she take the steps that could be taken to avoid that risk. So, yes, I most definitely believe, and I think even the U.K. courts and the Australia courts have accepted the fact that the consideration of what is unexpected or unusual is to be looked at from the standpoint of the passenger. And it does make good sense for the reasons that I've articulated. But I guess what that avoids is the basis of the passenger's expectation. In other words, where does the passenger get the expectation that this airline is going to warn about DVT? Well, the passenger, I think it could be a general expectation that when you pay money to go on a flight and be transported 12 hours sometimes, that if there is a danger that the passenger doesn't know about, but that the airline knows, that the airline will do something to inform that passenger, so the passenger is not endangered. It's a general. The expectation, then, is that the airline will act reasonably. Absolutely. Which is a great torchstander. Well, but here we're dealing with what is unexpected or what is unusual. So by its very nature, that aspect of it, you, there is going to be some, some evaluation of what the expectation of the consumer or the passenger is. But apart from that, so long as, and I think if you take a look at the Fulop opinion, so long as you have some involvement on the part of the carrier, then you have a basis upon which to find there is sufficient involvement, sufficient control on the part of the carrier, so that it does comport with the intent of the Warsaw Act to hold the carrier responsible for the effects on passengers over which that carrier has control. And so here, that control element is something that I think should be focused upon and something that I think when it comes to evaluating whether or not there is an accident, the Court could look at. And there's a wonderful, and I know the Court has looked at a wonderful discussion, evaluation of that concept in Fulop. And it really does stem all from the standpoint of under the Act, if we are going to retain a virtual strict liability that is not absolute, then what you want to do is hold the carriers responsible for the effects of those issues that it has control over. And that's what we're looking to do here. The carrier does have control over what information it will disseminate to its passengers and its decision not to, as we've shown here, causes injury and then should be compensable under the Act. We still are not talking about every injury being compensable under the Act. Certainly, if there is no involvement on the part of the carrier, say, for example, a passenger gets on the plane and unrelated to any cabin conditions has a heart attack, then there is no liability under the Act, because that's an injury that was not brought about by any carrier involvement. But here we do have carrier involvement. Kennedy. Well, but, okay, I'm not sure. This is not a bright-line area for sure, but heart attacks, for example, have been litigated under the Warsaw Convention. And if it occurs as a result of the normal operating, a reaction to the normal operating activities of the airline, airplane, that's not going to be an accident, correct? If it is just that, no. But if the question becomes, what is the crew's response? Well, that's true. That's the very, I understand that. But you said, basically, your standard, looking at it from the standpoint of the passenger, a passenger expects to be warned of the hazards from what presumably are normal flight operations. And that borders very close to a negligence standard. I don't believe it should. And really, there we're talking about the evaluation not so much of accident per se, but rather the unexpected or unusual aspect of accident. What we're looking at more directly is the control aspect of accident and the involvement of the airline in that control aspect. But I would admit, yes. I mean, by the control, I mean, the airline controls the flight of the airplane. So anything that happens. And it controls the information that is disseminated from the airline to the passenger. Well, it doesn't control it. I mean, obviously, the British newspapers were publicizing DVT risks for some time. So you're saying that a passenger only gets information about risks of flying from the airline. Well, it doesn't seem to be correct. Well, in this particular case, that is the state of the record. That Ms. Rodriguez did not have any knowledge about enhanced susceptibility to developing DVT from her riding on long air flights. There is absolutely no evidence that she was aware of the incident involving the young lady in Australia. I understand. She personally didn't know. But you say the airlines control the information. Well, they may be a point of information that's most relevant, but they're not the sole source. Well, no, but they are they should be the responsible source of information if they are the party that is transporting the passenger from one side to the other. And if it is the exposure to the conditions within that carrier's cabin that will result in the development of DVT. Then let me ask you this question under, at least from domestic flights, the FAA has jurisdiction, correct? On certain areas, yes. Does the FAA, if the FAA made a determination that DVT were a hazard on flights over 12 hours or 12 hours or more, and the airlines decided because they didn't want to create a regime in which they created a practice, they come back to haunt them, decline to issue warnings? Does the FAA have jurisdiction to impose the requirement as a matter of industry practice? The FAA presumably could, at least insofar as flights that either depart from or land here in the United States. It's a pretty substantial number. That would get the word out anyway. Well, you would think. But the FAA has not done so. No, but it has the authority to do so. It could do so. There is no explicit authorization within the statutes addressed in Witte, if that's what I understand the Court going to. And if I could address Witte very briefly, I believe that there is a case that really has no relevance to this particular issue here. It's a domestic case. It doesn't involve the Warsaw Act. So on that ground alone, right, I don't believe that it has any bearing upon the determination to be made by this Court, and that is whether there is any involvement in the carrier in the ultimate accident. I think, quite frankly, also that the Witte case is not very well decided, if I could be so bold. There really is not the analysis of either the Medtronic case or the Sipp-Lone case, cases that you would expect when you're dealing with the area of preemption. And the courts are very loathe to find Federal preemption unless there is an explicit authorization within the statutes. And taking a look through the Witte case itself, there is not the type of authorizing language that you find, for example, in the MDA. So I think that there is no indication there that the FAA meant to preempt the whole field. There's no indication of field preemption. I don't believe, certainly with respect to the area of warnings, there is no explicit preemption insofar as the area of warnings is concerned. And I don't believe there can even be a claim of conflict, because the FAA would have to issue some standard regarding what warning to be given in the event of the DVT, with regard to DVT, and the argument here in the Court would have to be inconsistent with. But it's not, as you say, not relevant to our case. It is not, Your Honor. And you've got about two minutes left. Do you want to reserve it? I would like to. Yes, Your Honor. The chair from the Appali airline. May it please the Court, Rod Margo and Scott Cunningham of Condon and Forsyth for Air New Zealand. It's very clear from Article 17 of the Warsaw Convention that what is required is an accident which causes damage on board the aircraft or in the course of the operation of re-barking or dis-barking. I think what is fatal to the appellant's argument, which he's acknowledged this morning, is that the so-called accident on which they're relying on is the decision by Air New Zealand not to adopt a DVT warning, to the extent that the so-called decision on the part of the airline to do so near the aircraft just cannot constitute an accident under any reading of Article 17 as elucidated by the Supreme Court in the sex and the affirmative. What about Hussein? I mean, let's suppose there was, let's suppose Air New Zealand all by itself decided that it was not going to do what every other airline did. This is hypothetical. The record doesn't reflect it, but that every other airline in its in-flight magazine and its pre-flight video points out that on long-distance flights it's imperative that passengers get up, walk, hydrate so that they don't suffer the effects, potential ill effects of DVT. And Air New Zealand decides, no, it won't do that. Are you saying that under Hussein that that would not constitute an accident because it didn't happen on the flight or in connection with the operation of the airline? In the way in which Hussein analyzed the case, under consideration, it would be conceivable that in that situation the omission would constitute an accident, or at least a step in the ultimate result which could conceivably constitute an accident, but clearly that is inconsistent with the facts of this case. Because there is no such industry practice. And there was no industry practice at all. So it doesn't turn on whether, this case doesn't turn on whether this happened on or off the airline, it turns on whether or not it comes under Hussein's definition, which is different from other Warsaw countries, at least Australia and Britain at the moment, which requires us to look at the industry practice or practice of the airline in question. Is that correct? I believe so, except that the Hussein case, I don't believe that the majority decision in Hussein was necessarily disagreeing with the decisions in Australia and in the UK. I think what the Court very carefully did was to acknowledge that the facts were fundamentally different, and I believe that in the famous footnote 9, there's a reference to the fact that the decisions of the Court of Appeal in England and the Victoria Court of Appeal in Australia were not inconsistent with what Justice Thomas was holding in the Hussein case. More importantly, I think that Justice Thomas in footnote 9 also indicates that the facts are significantly different in Hussein and in the DVT cases. And I think to that extent, the analysis has to be different as well. I mean, Hussein was clearly a case where the flight attendant had been asked on three occasions to move the passenger further away from the smoking section. And in that situation, she didn't respond. And clearly, whether you regard it as an omission or an act of commission, there was an accident. The Court found there was an accident on board. It was found at the district court level, it was found by this court, and it was confirmed by the Supreme Court. But where you've got a DVT situation, and particularly the facts of this case, there is absolutely no evidence at all of anything unusual or unexpected that occurred on this particular flight. All of the suggestions that counsel for the appellant has made about the fact that Singapore Airlines warned and other airlines warned is not supported by any evidence in the record. The statement that Cathay Pacific issued a warning in its inflight magazine comes from an extract from the Cathay Pacific magazine from March 2002, which is, well, significantly later than the date of this incident. It's in the excerpted record at page 444 to 446. This incident occurred in September of 2000. The so-called industry practice that is referred to from time to time in the cases, such as the International Air Transport Association in February or March of 2001, again, well after this incident occurred. But even then, the memorandum has not resulted in an industry standard, because there are numerous carriers, even to this day, that do not warn passengers about a DVT. So to suggest that the standard is what the reasonable passenger expects from the airline is simply not consistent with the way in which this law is being interpreted in this country. There has been research on DVT. It has been going on for many years. But the House of Lords report, which is included in the record, specifically says that the evidence was inconclusive. It's significant to note that on the excerpted record, page 176, that the House of Lords report on air passenger travel and health says that the actual incidence of DVT in those who have recently travelled by air is not known, because the appropriate scientifically rigorous epidemiological studies have not yet been carried out. This was a report which was trialled in October of 2000. It then refers to the fact that Mr. Scurr, who is the plaintiff's, the appellant's expert in this case, and Dr. Kesteven are both carrying out research in relation to this, and we look forward with much interest to seeing their reports. So even the appellant's expert, who submitted a report at first instance, acknowledges that there was no conclusive evidence at the time of this incident that DVT and air travel were related. And the House of Lords report also refers to a report that had just been brought to its attention, in which the authors concluded that there was no increased risk of DVT among travellers. So for a passenger such as Ms. Rodriguez to have anticipated that she would be warned by the airline of something that might have affected her health in this situation is simply simply not the test to be applied. There was no industry practice at the time, there is currently no industry practice that requires airlines to warn. I think Witte makes it very clear that there is no federal regulation that requires airlines to warn about DVT. Witte is significant because the federal aviation regulations apply to all foreign carriers that possess a foreign air carrier permit to operate into and out of the United States, and that includes Air New Zealand. So I don't see any basis on which... In my answer to follow up on the question I asked plaintiff's counsel, FAA could decide, even if Air New Zealand disagreed, could decide DVT were a sufficiently established risk and require carriers landing or taking off from the United States to warn passengers? Absolutely. If the FAA did that, then would the failure to observe such a regulation be an accident? Arguably it would, because it would be unusual or unexpected if an airline is required by regulation to warn, if it then doesn't warn. So you're saying any country by domestic law can define what an accident is under the convention? Well, arguably if a country that has jurisdiction over an air carrier, in this instance the government of New Zealand, the government of the United States, if they were to legislate a requirement that there be a warning to passengers on board about DVT, then conceivably failure to do so would be unexpected or unusual for purposes of Air France and SACS. I want to get back and ask you a question about this. I'm not sure which case. But footnote night in Hussein, you know, seems to be. Well, I don't know. Almost self-contradictory in treating the foreign cases. But seems to me you rely generally on those cases, don't you? The English case and the Australian case is supporting your position as they do. Right. Well, we do rely on them. They're not necessary to our position, but we do rely on them because they were squarely in our favor. But the question is whether that approach is inconsistent with Hussein, isn't it? I think to the extent that the that Lord Phillips in the Court of Appeals in England indicated that there was no distinction between an omission, an act of omission or an act of commission, I would agree that that's different to the finding in Hussein. But I don't believe that, I mean, I think footnote nine is definitely new territory, because Justice Thomas was saying that the Supreme Court did not consider itself necessary to follow the decisions of other jurisdictions, sister signatories, particularly where they were not the highest tribunal. But I think that all of the other cases in which have considered the issue, including Sachs, have indicated that the decisions of our sister signatories are important in interpreting an international treaty, a multilateral treaty. Final point that I wanted to note, what I wanted to note was that there was a warning given to passengers on this particular flight. Admittedly it was not specifically directed at DVT, but it was a health warning given on page 131 of Pacific Wave, which is the in-flight magazine. And the plaintiff did declare in a declaration that she had read the September 2000 issue of the in-flight magazine, and that included a warning to passengers on the importance of doing exercises in their seats and remaining hydrated. And that's been completely ignored in this appeal, but it's significant to the extent that plaintiff and appellant is relying on the notion that the airline completely ignored the interests of its passengers. And then of course, from a policy point of view, where does all of this end? If airlines are required to provide warnings about every conceivable thing that could happen aboard the aircraft, I think it's clear from a case like Sachs that pressure changes can cause damage to a person's ears. Similar facts occurred in a case called Warshaw versus TWA, reported in 442 FedSat 400, 1977, where a passenger suffered injury to her ear from the repressurization of the aircraft. The court found that that was not an accident. In Demarines versus KLM, 3rd Circuit decision in 1978, 580 FedSec 1293, the plaintiff felt an explosion-like feeling in his head as a result of change in pressure, and the court found that that was not an accident. Clearly, the change in pressure that occurs in an aircraft cabin can cause certain people with particular sensitivity certain problems. But that is not an unusual or unexpected event, and that's been very clearly held in the courts of this country. Finally, I think it's important to emphasize that the Sachs court said that the inquiry into whether or not there has been an accident is one which looks at the nature of the event which caused the injury rather than the care taken by the airline to avert the injury. It is not a negligent standard. It is an interpretation of the provision of the Convention. The Warshaw Convention was adopted in 1929. One of its primary purposes was to limit the liability of the air carrier. I'll reserve this that I have for... You can't reserve it. You're the appellee, but I think we have your argument. Thank you. All right. Let's hear the rebuttal. Thank you, Your Honor. There is no dispute in this case but that Air New Zealand had knowledge of the connection between their cabin conditions and the development of deflating thrombosis. That was presented quite squarely in the appellant's response to the separate statement of facts, and there was never any dispute, nor could it really dispute the fact that it knew about DVT, how DVT developed. So what is being argued here is that there is really an industry standard on the part of the airlines to hide information from the public. That's really what I hear if you really take what the appellee's argument is here. And that certainly cannot be the case, and that is why we should not look at industry standards necessarily in evaluating whether there is or is not an accident. And, in fact, that issue was directly addressed during the oral argument in the Hussein case to counsel for the United States of America, who was there on behalf of Hussein. And in that case, the government quite clearly said, and it's the position of the United States government, as indicated in that argument, that you don't, although you perhaps can under certain circumstances look at standards, you don't necessarily have to look at standards, because if you do, then all of a sudden you're getting into more of a negligence type of evaluation here. What you look at is the extent to which there is control or contact by the air carrier with what brings about and causes the injury in here, the DVT. But how does this differ from SACS and the air pressure causing deafness? Most definitely is different, because here the airlines are well aware that thousands of their passengers each year develop deep vein thrombosis. Some of those passengers embolize. Everybody knows that you can have severe, you fly with a cold and you get a deceleration or acceleration, you can puncture an eardrum. Sure, but we're not talking about here situations which might be specific to a particular individual, idiosyncratic, radiopathic sensitivities of a particular individual. We're dealing here with sensitivities of humankind generally, where you have thousands of events such as this taking place. And the question is when the airlines know this and when the airlines rely upon the passengers for their income, is it not reasonable for those passengers to be given information that the airline has? What policy argument is furthered by supporting or suggesting, as the appellee would suggest, that if there is no standard, the airlines can hide the information they have and then just say, well, we don't have the obligation to respond to an injury under the Warsaw Act because we were ignoring this risk, and by ignoring this risk, we are depriving our passengers of fair compensation for the injuries that we caused. And that's really what we're looking at here, and that's how I think we can go beyond just looking at is there is or is there not a standard or a law in effect and look at really what is the involvement of the carrier. And that is what I think the Court did in Fulop, and I believe that is the evaluation that should be taken, along with this United States Supreme Court's recognition that this act-omission dichotomy is something that we here in the United States do not need to get involved in. All right. We understand your argument. We appreciate it. Thank you. Mr. Robbins, I can ask this question. I didn't deal with this case, but what's your name? Are you related to Clay Robbins, Jr.? I'm his son, yes. You're his son? The famous race car driver? Yes, at least in his family, he was. And clerk of the Second District Court of Appeal? He was for quite a few years, Your Honor. Terrific man. All right. Thank you, sir. This case is submitted. And we thank both sides for your fine argument, right? Case is submitted for decision.
judges: Tg Nelson, Tashima, Fisher